IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-60485
Summary Calendar
_____


EDDIE HARRIS,

                                        Plaintiff-Appellant,

versus

DOUBLE G. COATINGS, INC.,

                                        Defendant-Appellee.


--------------------
Appeal from the United States District Court
for the Southern District of Mississippi, Jackson Division
(3:95-CV-478-LN)
--------------------
May 5, 1997
Before GARWOOD, JOLLY, and DENNIS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

    Eddie Harris appeals the district court's grant of summary judgment to Double G. Coatings, Inc., in his Title VII and 42 U.S.C. § 1981 employment discrimination lawsuit.  We affirm.

### Facts and Proceedings Below

    Double G. is a continuous process steel coating mill which operates year-round on a twenty-four hour basis.[1]  In June of 1995

---

[*]    Pursuant to Local Rule 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

[1]    Double G. is a corporate joint venture between National Steel Corporation and Bethlehem Steel Corporation, each of whom owns fifty percent of Double G.'s stock.

Harris, who is black, was employed by Double G. as an Electrical Maintenance Technician. Joe Bagwell, who is white, also worked for Double G. as a Mechanical Maintenance Technician. Both men had been hired by Double G. in 1993, shortly after its Jackson plant began start-up operations.

On June 8, 1995, Double G. posted a notice advising that, due to the promotion of Mike Meadows from Mechanical Engineer to Plant Manager, there was an opening available for the position of Mechanical Maintenance Coordinator (MMC). This notice stated in pertinent part the following:

> "**Qualified Mechanical Maintenance Coordinator Candidates Must Possess:**
> - **A 4-year B.S. college degree in a related technical field, preferably in mechanical engineering; or a 2-year technical college degree and 10 years of mechanical maintenance and supervision; or no advanced degree and 20 years of mechanical maintenance and supervision,**
> - **Excellent technical knowledge of the coating line,**
> - **Good communications and interpersonal skills,**
> - **Leadership ability, and**
> - **Solid team orientation.**"

The notice did not set forth any additional qualifications or criteria to govern how the promotion decision would be made.

Four Double G. employees applied for the position; of these, only two, Harris and Bagwell, met the minimum requirements established by the job notice. Both Harris and Bagwell were interviewed by Meadows, who ultimately decided to give Bagwell the promotion.

Harris, upset with this result, filed this lawsuit on July 7,

2

1995, asserting violations of 42 U.S.C. § 1981 and Title VII. Harris alleged that he had been denied advancement in the company due to his race and thus was a victim of Double G.'s allegedly discriminatory employment practices.[2] Double G. moved for summary judgment on January 3, 1996; the district court granted this motion on May 10, 1996. Harris moved on May 28 to alter or amend the judgment, or "for relief from judgment," or for reconsideration, and on May 29 to amend his complaint. Both motions were denied on June 25, 1996. Harris timely noticed an appeal from the district court's final judgment of May 10 and the May 25 order denying his post-judgment motions.

## Discussion

In reviewing a district court's grant of summary judgment we consider the record *de novo*, applying the same legal standards which governed the district court's determination. *Wittorf v. Shell Oil Co.*, 37 F.3d 1151, 1154 (5th Cir. 1994). We first determine the applicable law in order to isolate material factual issues and then review the admissible summary judgment evidence bearing on those issues, viewing all facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *MacMillan v. United States*, 46 F.3d 377, 380 (5th Cir.

---

[2] Double G. has an established policy against employment discrimination and a procedure whereby a human resources manager receives complaints regarding violations of the policy. Harris opted to forego Double G.'s internal grievance procedure.

3

1995) (citations omitted).

In a failure to promote case under Title VII and/or section 1981,[3] the plaintiff bears the initial burden of demonstrating a *prima facie* case of discrimination. *Gonzalez v. Carlin*, 907 F.2d 573, 578 (5th Cir. 1990), *citing Texas Dept. of Community Affairs v. Burdine*, 101 S.Ct. 1089, 1093 (1981). If the plaintiff is able to make out a *prima facie* case, the burden of production shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for not promoting the plaintiff. *Williams v. Time Warner Operations, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996). If the employer articulates such a justification for its action, the burden shifts back to the plaintiff to show that the employer's proffered reason(s) are pretextual; this final burden merges with the plaintiff's ultimate burden of persuading the court that he or she has been the victim of intentional racial discrimination. *Burdine*, 101 S.Ct. at 1095.

For purposes of this appeal we assume, as did the district court, that Harris was able to establish a *prima facie* case. Furthermore, we find Double G.'s stated reasons for promoting Bagwell over Harris to be both legitimate and nondiscriminatory. Thus, we turn to an assessment of whether Harris produced

---

[3]    The elements of unemployment discrimination claims under Title VII and section 1981 are identical. *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994) (citations omitted), *cert. denied*, 115 S.Ct. 1099 (1995).

sufficient evidence of pretext to render the alleged discriminatory intent of Double G. a triable issue. *See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989 (5th Cir. 1996) (en banc).

Double G.'s proffered reason for promoting Bagwell is in essence a submission that it considered he was better qualified for the job than was Harris. Harris counters that, based upon criteria established by Double G., it was he who possessed the superior credentials. The nature of this dispute obligates us to engage in a comparison of the two men's qualifications at the time of the promotion to determine whether any disparity in those qualifications supports an inference of purposeful discrimination. We emphasize, however, that the issue in this case is *not* which man was in fact more qualified,[4] but rather whether Harris's objective qualifications for the MMC position so clearly exceeded those of Bagwell that a reasonable juror could affirmatively conclude that invidious discrimination, rather than an assessment of qualifications, was shown to have in fact played a part in Double

---

[4] Our inquiry is limited to the existence *vel non* of a racially discriminatory animus on Double G.'s part. Consequently, we decline "to weigh the wisdom of any particular employment decision; Title VII does not authorize federal courts to sit as a super-personnel department that reexamines an entity's business decisions." *Ruby v. Springfield R-12 Public School Dist.*, 76 F.3d 909, 912 n.7 (8th Cir. 1996) (citation omitted) (internal quotation marks omitted). Stated another way, "[Harris] must create an issue as to whether the employer honestly believes in the reasons it offers, not whether [Double G.] made a bad decision." *Sample v. Aldi, Inc.*, 61 F.3d 544, 549 (7th Cir. 1995) (citation omitted) (internal quotation marks omitted).

5

G.'s promoting Bagwell over Harris. *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 813-814 (5th Cir. 1991); *Thornburgh v. Columbus & Greenville R. Co.*, 760 F.2d 633, 647 (5th Cir. 1985). This approach is based upon the straightforward view that "[e]veryone can make a mistake—but if the mistake is large enough, we may begin to wonder whether it was a mistake at all." *Amburgey*, 936 F.2d at 814, *quoting Thornburgh*, 760 F.2d at 647. Accordingly, we examine the competent summary judgment evidence adduced to determine whether Harris was "clearly better qualified" for the position of MMC than Bagwell.[5] *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1184 (5th Cir. 1996); *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 42 (5th Cir. 1996); *EEOC v. Louisiana Office of Community Services*, 47 F.3d 1438, 1444 (5th Cir. 1995); *Odom v. Frank*, 3 F.3d 839, 845-846 (5th Cir. 1993); *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992); *Amburgey*, 936 F.2d at 813-814; *Thornburgh*, 760 F.2d at 647.

As a threshold matter, we must determine what criteria Meadows

---

[5]    Obviously, our review is concerned with evidence bearing upon the relevant qualifications of the men that were known by Double G. at the time the employment decision was made. Harris argues in brief that Bagwell's two prior criminal convictions and his involvement in a gas leak which occurred several weeks after he was promoted serve to undermine his qualifications for the position. The record reveals that the convictions were not known to Double G. until Bagwell was deposed for purposes of this lawsuit, and of course the leak occurred *after* the employment decision had been made. These matters are therefore irrelevant to the issue presented, their consideration being a proper matter for Bagwell's supervisors at Double G. and not this Court.

6

and Double G.'s president, Sam Moore, devised to govern the promotion decision. Harris argues that the notice posted by Double G.'s management provides the exclusive criteria; in so doing he seeks to present himself, through a bizarre calculus based upon the education and work history criterion set forth disjunctively in the first subpart of that notice, as the most qualified candidate by virtue of a mathematical *fait accompli*. We disagree with Harris's reading of the notice, finding instead that the qualifications contained therein are *minimum* qualifications, *i.e.*, qualifications which competent candidates "must possess," designed to limit the pool of prospective applicants.[6] As such, the notice, while it might have functioned as an indicator of factors Meadows would consider, did not necessarily prescribe the exclusive criteria governing Double G.'s decision.

Turning to the language of the notice itself, we observe that the requirements set forth in its first subpart are stated disjunctively. Unlike Harris, we do not discern from this any priority to educational achievement; rather, possession of the requisite education *or* work experience suffices to qualify an individual under this subpart.[7] Additionally, the first subpart,

---

[6] This reading is supported by the deposition testimony of Meadows and Moore, who testified that educational background was listed first because they understood that to be the convention in formulating job notices.

[7] This reading accords with Moore's deposition testimony, which relates that satisfying the listed qualifications, including *any* of

7

while typically the most plainly discernible from a resumé, comprises only one of five listed criterion. The notice does not expressly assign to any of these criterion a place of pre-eminent importance and we decline to imply such a hierarchy.

We review the qualifications of the two men based upon the factors set out in the notice *as they relate to what the record reveals are the actual requirements for the job at issue.* While Harris is certainly entitled to challenge Double G.'s characterization of the industrial philosophy underlying the subject position, he has failed to present any competent evidence rebutting the affidavits and deposition testimony discussing the role of the MMC in the context of Double G.'s "mini-mill" scheme.[8] *See EEOC*, 47 F.3d at 1445-1446 ("we decline to substitute our

---

the three set forth in the first subpart, entitled the applicant to an interview. In addition, Moore and Pat VanDomelen, Double G.'s human resources manager, both testified that the notice for the MMC position was based upon an earlier notice seeking candidates for a Team Coordinator position, a production line job which required more in the way of traditional management skills than the MMC position. Both Moore and Mike Meadows stated that the promotion decision was based on "the entire package" that the applicants brought to the table.

[8]     Harris did state in his deposition that the subject position was merely an ordinary "supervisory" position, but provided no specific details or examples to support this quite general conclusion. Given the copious amount of specific and detailed information provided by Double G., particularly in the affidavits and deposition testimony of Ezio DiFrancesco and Meadows, regarding the "continuous improvement" approach underlying Double G.'s "mini-mill" concept, Harris's self-serving conclusory statements are insufficient to create a triable fact issue on this point. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

judgment for the employer in evaluating what types of experience are most valuable for an employee in the new position in the absence of proof that the standards were not consistently applied or were so irrational or idiosyncratic as to suggest a cover-up"); *Odom*, 3 F.3d at 847 ("as a general rule judges are not as well suited by training or experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in the field of endeavor for which the applicants under consideration are being evaluated"). Accordingly, we compare the two men's backgrounds and demonstrated abilities in light of what the record reveals are the actual parameters of the MMC position and decline to speculate concerning hypothetical job descriptions extrapolated from the promotion notice.

In June of 1995, Harris, the plaintiff, held a Bachelor of Science Degree in Industrial Technology Management from Jackson State University and an Associate Degree in Electronic Technology from Hinds Junior College. He testified during his deposition that he had worked at Siemens-Allis for nine years; during his first four years there he tested circuit breakers, and the remainder of his time he spent as a senior engineering technician. Harris then moved to Vickers, Inc., where he worked from 1980 until 1993 as a "maintenance supervisor." Harris asserts that his duties at both Siemens and Vickers required him to engage in both mechanical and

electrical maintenance, but concedes that after 1990 he performed almost exclusively electrical maintenance work.

In June of 1995 Bagwell had over twenty years of experience as a mechanic, having worked as a millwright for Connor Steel Corporation, in Birmingham, Alabama, from 1970 through 1983, and as a hydraulic technician for Bayou Steel in LaPlace, Louisiana, from 1983 through 1991. During his last two years at Bayou Steel Bagwell was "lead man" in the Hydraulic Department, a supervisory position. From 1991 to 1993, when he was hired by Double G., Bagwell worked as a repairman, fixing and refitting mobile homes. Bagwell had minimal academic qualifications, having attended a junior college, in an industrial engineering curriculum, for only one year.

Turning to the other competent record evidence, we consider first the affidavit and deposition testimony of Ezio DiFrancesco, an operation consultant for Bethlehem Steel-Homer Research Lab who assisted in the start-up phase of Double G.'s Jackson plant. In his affidavit, DiFrancesco averred that he has trained numerous supervisory employees for positions like Double G.'s MMC and discusses the technical adaptability and basic mechanical know-how required of the position. DiFrancesco tied this job description into the "mini-mill" concept underlying Double G.'s operation. The mini-mill concept is characterized by a lean management team and production and maintenance teams exercising a significant amount of autonomy. Essential to this approach is the "team concept" wherein

10

team coordinators must take a "hands-on" approach and lead their team to focus on improving production parameters by redesigning out, rather than simply patching over, problems which occur on the line. This emphasis on "continuous improvement" is the means by which the plant is to remain competitive by reducing the duration and frequencies of delay due to mechanical breakdown.

DiFrancesco also recounted his seven months of experience in setting up the Jackson operation. Having worked with both Harris and Bagwell, DiFrancesco noted Bagwell's proven ability to implement mechanical improvements, providing six separate examples of particular mechanical problems resolved by Bagwell during his time in Jackson. DiFrancesco criticized Harris for lacking initiative and persistence, as in Bagwell's case providing specific examples illustrating the basis for his opinion, and stated that Harris would have needed additional training to bring him up to specification for the MMC position.

David Hair, a project engineer for Double G. during its start-up phase who worked with both men, observed that Bagwell worked better with subordinates and possessed a more detailed mechanical knowledge of the machinery on the line. Hair also stressed Bagwell's problem-solving skills and his ability to communicate effectively with other mechanics. Hair noted that Harris did not typically work overtime and had a tendency to do only what was required, while Bagwell was willing to work for as long as it took to fix mechanical problems. Hair did not observe Harris manifest

even adequate mechanical maintenance skills, Harris's duties being confined largely to electrical work. Hair echoed DiFrancesco's statements concerning the "mini-mill" concept and the employment criteria prompted by it.

Mike Meadows, who actually made the decision to promote Bagwell, stated in his deposition that he decided to go with Bagwell based upon his twenty-one years of mechanical "hands-on" experience, his steel background, his rapport with the other mechanical maintenance technicians, and his initiative. Meadows also noted approvingly that Bagwell had successfully assumed Meadows' position in the past when Meadows was required to be out of the plant.[9] Meadows related that Bagwell had been instrumental in helping the plant get up to speed during its start-up phase, helping solve mechanical problems that arose and intimately familiarizing himself with new equipment. Meadows emphasized Bagwell's familiarity with the furnace and the welder, items

_____

[9]    Harris suggests in brief that the MMC position was essentially the same as that of Mechanical Engineer, the position Meadows had prior to being promoted. Harris urges that because the MMC was therefore a classical management position his greater supervisory experience should have made him front-runner for the job. Both Meadows and Moore related during their depositions, however, that when Meadows was promoted to plant manager the position of Mechanical Engineer was abolished and that of the MMC was created. This was because at that point the "start-up" phase of the plant had ended and the actual production phase had begun; thus, there was less need for a supervisory engineer and more need for an innovative team leader familiar with the day-to-day functioning of the equipment on the line. Meadows connects this job function to the "continuous improvement" concept, where problems are not patched up but corrected through mechanical innovation.

essential to the plant's production and maintenance functions. Meadows conceded that Harris had more formal education and formal supervisory experience than Bagwell, but countered that he found Bagwell's experience supervising mechanics at Bayou Steel more pertinent than Harris's generalized supervisory experience, which involved electrical and mechanical personnel in a non-steel setting.

Meadows observed that while he wanted the MMC to have some supervisory experience, this qualification was not as significant as the candidate's ability to take a "hands-on" approach to addressing the mechanical maintenance needs of the plant. This was because, under the "continuous improvement" doctrine, it was essential that the MMC be able to solve mechanical problems as they arose. Intangibles such as teamwork, drive, and initiative were also involved in his deliberations, as the MMC must not only diagnose complications on the line but also rapidly and effectively implement repair schemes to remedy problems as they arise, all within the context of the "team" concept.

Nick Kincaid and Ray Davis, Electrical Maintenance Engineers for Double G. and Harris's immediate supervisors, submitted affidavits and provided deposition testimony. Both Kincaid and Davis emphasized Bagwell's ability to solve problems and Bagwell's stellar performance as fill-in maintenance supervisor on occasions when Meadows was out of the plant. Additionally, both men observed that Bagwell was more willing to put in overtime hours than was

Harris and assessed Harris's job performance as mediocre. Davis, who is black, also asserted that Harris lacks sufficient experience, most of his career having been spent in electrical maintenance, to handle the mechanical maintenance position's demands. Davis noted that of four contemporaneous promotions from hourly-wage to salaried status, three of those positions went to black persons, with Bagwell being the only white person promoted.

Harris countered Double G.'s evidence with his own deposition and accompanying affidavit, and the deposition testimony of Joe Cowart, a mechanical technician at Double G. Harris posited that he was better qualified than Bagwell and that, contrary to Double G.'s belief, he in fact possesses extensive mechanical knowledge. Harris was able to give one example of a mechanical modification he had made which had improved the efficiency of the line. Harris also suggested that his electrical experience would have made him a better supervisor because of his superior ability to deal with electrical as well as mechanical problems. Harris claimed that "many" employees felt he should have received the promotion, but is able to name only one, Joe Cowart.

Cowart testified during his deposition that had he made the promotion decision Harris, who is his good friend, would have received the promotion. Cowart also submitted an affidavit in which he averred that "I do not believe that Eddie was not promoted because of his race."

We observe initially that Harris's generous and largely

14

conclusory appraisal of his own abilities *vis-a-vis* Bagwell is for the most part unsubstantiated. The evidence proffered by Double G. contains numerous detailed accounts of Bagwell's mechanical ability, drive, and initiative; Harris's submissions do not negate or otherwise controvert this evidence, nor do they provide comparable evidence on Harris's behalf. Harris's contention that his electrical experience would make him more valuable is inapposite; as we have already stated, it is Double G., not Harris or this Court, which determines the parameters of its job positions. Cowart's unsubstantiated opinion is probably inadmissible lay opinion and is in any case negated by the contents of his affidavit.

Based upon the evidence adduced, we conclude that the district court did not err. While Harris attempts in his brief to exalt his (largely inapposite) academic achievement and greater supervisory experience over Bagwell's practical mechanical experience, the record makes it clear that the position concerned was not a classical management position but rather a hybrid of supervisory and technical elements. It is also evident that Bagwell's mechanical knowledge, steel background, and related attributes carried more weight, in light of the MMC's duties and responsibilities, than the limited mechanical and generalized supervisory experience offered by Harris. *Compare EEOC*, 47 F.3d at 1446 ("we cannot say that it is irrational for an employer to give

less weight to general supervisory experience than actual field experience where field experience is relevant to the position"); *Odom*, 3 F.3d at 846 ("[t]he fact that [plaintiff]'s primary experience did not match the position sought was legitimately relevant and significant to the [employer]'s determination"). Bagwell's experience in the areas most relevant to the performance of *this* job, particularly his demonstrated knowledge of the machinery on the line and his problem-solving abilities, combined with his drive, initiative, leadership, and communication skills made him well-suited for the position of MMC. Even with all reasonable inferences construed in his favor, Harris may at most be viewed as possessing similar qualifications, but not superior, much less clearly superior, qualifications, for the position of MMC.

In sum, our record review convinces us that Harris was not "clearly better qualified" than Bagwell for the job. In so stating, we decline Harris's invitation to fine-tune or otherwise vary the criteria which Double G. chooses to govern its promotion decisions. *See Odom*, 3 F.3d at 847 ("we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question"). We reiterate that Title VII "was not intended to be a vehicle for judicial second-guessing of business decisions, nor was it intended to transform the courts into personnel managers." *Thornburgh*, 760 F.2d at 647 (citation

16

omitted).  This argument must fail.

Our conclusion that Harris was not "clearly better qualified" than Bagwell does not end our consideration of Harris's claim, as it is possible that Harris may be able to establish discriminatory intent by other evidence indicating purposeful discrimination. *Amburgey*, 936 F.2d at 814; *Thornburgh*, 760 F.2d at 647.  We thus turn to the other points raised in Harris's brief as indicators of discriminatory animus.

Harris points out, perhaps in an attempt to undermine Bagwell's qualifications for the position, that Bagwell was dismissed from Bayou Steel in 1991 for "theft of company work time" arising out of excessive use of the company phone, that Bagwell has two prior criminal convictions, and that Bagwell stated in his initial letter of interest to the company that he had twenty-three years of experience, when in fact he had worked as a mechanic for only twenty-one years.  Assuming *arguendo* that Double G. had some knowledge of these incidents at the time the employment decision was made (see note 5, *supra*), Harris has not directed our attention to any policy or practice of Double G. regarding such matters. Double G.'s decision to forgive some or all of the past sins of its employees' is purely an internal matter as long as such practice is administered in a fair and non-discriminatory manner.  Because Harris's allegation does not suggest any instance of disparate treatment, it cannot bolster his failing case.  *See Thomas v.*

17

*Metroflight, Inc.*, 814 F.2d 1506 (10th Cir. 1987); *Jackson v. City of Killeen*, 654 F.2d 1181 (5th Cir. Unit A 1981).  Insofar as Harris suggests that Double G. *must* negatively consider such matters in reaching its employment decisions, the contention is without merit.

Harris next argues that discriminatory intent may be inferred from the fact that two unqualified white applicants were nonetheless interviewed for the MMC position.  Mike Meadows' deposition testimony recounts that these interviews were merely "courtesy" interviews and that those interviewed were not seriously considered for the position.  Nothing in the record controverts Meadows' declaration, and of course these men did not receive the promotion.  Harris's argument is insubstantial.

Harris also cites in his affidavit an incident unrelated to his application for promotion to MMC as evidence of invidious discrimination:

> "I was discriminated against when I was told by Pat Van Domelen, Human Resources Manager that Double G. was looking for a degreed Electrical Engineer to supervise the Electrical Maintenance Technicians.  However, Nick Kincaid, a white male was hired for the position and he has no degree of any sort.  Furthermore, I have more years of Electrical Maintenance and supervisory experience than does Nick Kincaid."

There is no record evidence that Harris ever applied for the position or followed up in any way his alleged conversation with VanDomelen.

During her deposition, Pat VanDomelen, who had not worked in

18

the industrial field prior to her employment with Double G., did not recall this particular conversation. She did state that her initial impression had been that the company was seeking a degreed engineer; and that this initial belief that a degree in electrical engineering was required was due in part to her misapprehension of the term "electrical engineer." Until otherwise informed by Robert McHenry, the company's first president, VanDomelen labored under the mistaken belief that in the industry this term denoted a degreed engineer rather than a person with relevant work experience in the field. Both she and Sam Moore testified that when the company began receiving resumes McHenry and the project engineers were looking for an individual with relevant work experience, and that Kincaid, with three years towards a degree in electrical engineering and a significant background in the field, fit the bill.

Harris has presented nothing which controverts VanDomelen's admission that her statement to Harris, if it actually occurred, was based upon her mistaken belief. Such an honest mistake cannot support an inference of purposeful discrimination. *See Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150 (7th Cir.), *cert. denied*, 115 S.Ct. 359 (1994); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160 (5th Cir. 1993). Accordingly, Harris's contention is meritless.

Harris next asserts that discriminatory animus may be inferred from the fact that he was forced to take a Management Aptitude Test

19

as part of the promotion process, a test which Bagwell was not required to take. The record reveals that Harris took this test as part of the application process for a Team Coordinator position, a production line job that, unlike the MMC position, requires more in the way of classical management skills.[10] All candidates for the Team Coordinator position were required to take the MAT; there is no evidence that *any* of the applicants for the MMC position were required to take this test. Given the total absence of any indication of disparate treatment, this submission cannot form the basis for an inference of purposeful discrimination. *Thomas; Jackson*.

In addition to his claim arising from being denied promotion to MMC, Harris also contends that the district court erred by viewing Double G.'s decision not to promote him to the position of Electrical Maintenance Engineer only as general evidence of Double G.'s discriminatory animus and not as a separate and distinct claim for relief. The district court relied on Harris's deposition testimony that this lawsuit was based on the mechanical maintenance position in finding that this prior incident was at best arguable evidence of discrimination and not a separate and distinct claim. Our review of the record also reveals statements by Harris's attorney during a deposition conveying the same impression. Contrary to Harris's contention, it was not the district court's

_____

[10]    Two other applicants, both black, were selected for this position over Harris.

20

job to extrapolate all possible causes of action latent in his pleadings; rather, once Double G. had presented sufficient evidence to negate an element of Harris's discriminatory employment practices case, *i.e.*, the existence of discriminatory intent, the burden then shifted to Harris to go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Little*, 37 F.3d at 1075. This Harris failed to do. Accordingly, we reject his submission.[11]

Finally, Harris challenges as error the district court's refusal to allow an amendment to his pleadings. Harris moved to amend his pleadings on May 29, 1996, long after discovery had ended and nineteen days after summary judgment had been rendered and his

---

[11] Although our conclusion is sufficient to defeat Harris's claim, we have already noted that the record does not indicate that Harris ever applied for the position of Electrical Maintenance Engineer. *See Bernard v. Gulf Oil Corp.*, 890 F.2d 735, 745 (5th Cir. 1989) (failure-to-promote plaintiff must prove, *inter alia*, that he or she applied for an available position), *cert. denied*, 110 S.Ct. 3237 (1990), *quoting Burdine*, 101 S.Ct. at 1094. Even had Harris applied for the position, however, we have no record evidence regarding the criteria Double G. used in making that decision. Given Kincaid's three years of college courses towards an Electrical Engineering degree and his extensive experience in the electrical engineering field as related by the deposition testimony of Sam Moore, Harris has not demonstrated he was "clearly better qualified" for this position. Additionally, we reiterate that there is nothing in the record to indicate that Pat VanDomelen's alleged imparting of false information was anything other than a mistake. Assuming *arguendo* that Harris's failure to be promoted to the position of Electrical Maintenance Coordinator is a separate claim, this record would not allow a reasonable juror to find the discrimination Harris perceives.

21

lawsuit dismissed.[12]  Affirming the district court's grant of summary judgment, we find no abuse of discretion in the district court's denial of Harris's motion to amend his complaint. *Moody v. FMC Corp.*, 995 F.2d 63 (5th Cir. 1993). *See also Little*, 37 F.3d at 1073 n.8.

For the preceding reasons, the judgment of the district court is

AFFIRMED.

---

[12]  Harris' motion to amend his complaint was filed a day after his Rule 59 motion.